**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| EMANUELLA NKEM NNADOZIE, | * | |
| Plaintiff, | * | |
| v. | * | Civil No.: BPG-15-391 |
| MANORCARE HEALTH SERVICES, LLC, et al., | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Plaintiff Emanuella Nkem Nnadozie ("Nnadozie," or "plaintiff") brings this employment discrimination action against defendants Manorcare Health Services, LLC, HCR Manor Care Services, Manorcare–Woodbridge Valley MD, LLC, Manorcare Health Services–Woodbridge Valley, and Heartland Employment Services ("HES" or "defendant"), alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, et seq., and 42 U.S.C. § 1981, based on a series of events which resulted in her termination from her position as a registered nurse.[1]  Currently pending before the court are: (1) Plaintiff's Motion for Reconsideration and Relief from the District Court's Determination Granting Defendant's Motion for Summary Judgment ("Plaintiff's Motion") (ECF No. 67); (2) Defendant's Opposition to Plaintiff's Motion for Reconsideration ("Defendant's Opposition") (ECF No. 69); and (3) Plaintiff's Reply Brief in Support of Her Motion for Reconsideration and Relief from the District Court's Determination Granting Defendant's Motion for Summary Judgment ("Plaintiff's

---

[1] On November 28, 2016, this court ruled that that only HES was plaintiff's employer and granted summary judgment as to all remaining defendants.  (ECF No. 44 at 1).  Plaintiff does not challenge this ruling, so the court will only consider plaintiff's motion for reconsideration as to HES, and HES will hereinafter be referred to as "defendant."

Reply") (ECF No. 70).  The issues have been fully briefed, and no hearing is necessary.  Loc. R. 105.6.  For the reasons stated below, Plaintiff's Motion (ECF No. 67) is denied.

I.      **BACKGROUND**

In ruling on a motion for summary judgment, this court considers the facts and draws all reasonable inferences in the light most favorable to the nonmoving party.  Scott v. Harris, 550 U.S. 372, 378 (2007).  In this case, plaintiff is asking this court to reconsider its finding of summary judgment in favor of defendants (ECF No. 44).  Defendants, however, were the parties who originally moved for summary judgment.  (ECF No. 32).  Accordingly, plaintiff is the nonmoving party, so all facts will be considered and all reasonable inferences will be drawn in the light most favorable to plaintiff.

Plaintiff was hired on May 15, 2013, as a Night Shift Registered Nurse ("RN") Supervisor by Heartland Employment Services ("HES" or "defendant") at the Woodbridge Facility.  (ECF No. 32-1 at 13).  Manorcare–Woodbridge Valley MD, LLC, owned the Woodbridge Facility and leased employees from HES, including plaintiff.  (ECF No. 32-1 at 50).  Plaintiff previously worked as a R.N. Supervisor at Future Care Health Care Corporation and as an Assistant Director of Nursing at Genesis Health Care Corporation ("Genesis").  (ECF No. 32-1 at 13).  Plaintiff, a black female, was born in Sierra Leone and lived in Nigeria and France before moving to the United States in 1996 at age 19.  Id.

At the Woodbridge Facility, plaintiff was directly supervised by the Administrative Director of Nursing Services ("DON").  (ECF No. 69 at 10).  Prior to October of 2013, this role belonged to Alisa Davis, a black female.  Id.  In October 2013, however, Davis left, and the role was filled by Michelle Jambora, a Filipino female, who acted as the interim DON.  Id.  On October 1, 2013, Jambora called the Woodbridge Facility three times during the night shift.

(ECF No. 69 at 11). Plaintiff alleges that, at first, no one responded when she answered the phone. (ECF No. 39 at 2). On the third time, she alleged that Jambora "screamed at [plaintiff] and threatened her job . . . accused [plaintiff] of not doing her job . . . questioned whether [plaintiff] could be a supervisor at all and accused her of inability [sic] manage her employees." Id. Plaintiff further stated that the call "left [plaintiff] in tears, feeling like she had incurred a physical attack." Id. That day, plaintiff wrote a letter to Elizabeth Kaczor, the Vice President of Human Resources ("HR"), and expressed her concerns with the way Jambora spoke to her. (ECF No. 69 at 11).

Over the subsequent few weeks, plaintiff alleged that Jambora reassigned her from being a House Supervisor to a Floor Nurse seven to ten times, which she described as "essentially a demotion," and gave her additional duties. (ECF No. 39 at 3–4). Plaintiff further alleged that no other nurse was assigned additional or floor work duties. Id. Plaintiff then spoke with HR Representative Karen Boxen and Jambora about the October 1, 2013 phone call and plaintiff's floor work assignments.[2] (ECF No. 39 at 5). Plaintiff also spoke with Staci Froelich, the Administrator of the Woodbridge Facility, on October 23, 2013, regarding Jambora's conduct. (ECF No. 39 at 5). Plaintiff alleges that, during this meeting, she asserted her belief that Jambora would treat her more fairly if she were not black. Id.

Plaintiff was injured at work on October 30, 2013 and was out on medical leave until December 30, 2013. (ECF No. 69 at 12). Plaintiff alleges that, upon her return on December 30, 2013, she was told by Jambora that "she could choose between her old position but working additional time, or working as a floor nurse." (ECF No. 39 at 5). Plaintiff did not accept either, however, as she was still recovering from her injury, and returned to work on limited duty. (ECF

---

[2] Plaintiff alleges that this meeting took place on October 14, 2013 (ECF No. 39 at 5), while defendant alleges that it occurred on October 16, 2013 (ECF No. 32-1 at 17).

No. 37-1 at 6). Plaintiff was primarily responsible for reviewing lab results and notifying patients and family members of abnormal results. (ECF No. 69 at 12). On December 30, plaintiff also met with Regional HR Director John Kolesar and Froelich to discuss her concerns that "Jambora was discriminating against her and continuing to harass her, and that nothing had been done about it." (ECF No. 39 at 5).

On January 13, 2014, plaintiff documented in resident J.B.'s progress notes that she had informed the responsible party ("RP") of J.B. (her daughter, C.B.) that J.B. had abnormal lab results. (ECF No. 69 at 12). Earlier that day, however, the morning staff was informed that C.B. had passed away over the weekend. Id. Another RN Supervisor, Cordilia Agbam, noticed this discrepancy and "became concerned that resident J.B.'s lab result had not been provided to the correct person." Id. Agbam reported this issue to Jambora. Id. On January 15, 2014, plaintiff was called into a meeting and asked about the progress note. (ECF No. 39 at 12). Plaintiff stated that she called and spoke with someone who claimed to be J.B.'s RP. Id. Plaintiff was then suspended without pay pending an investigation of the incident. Id.

During the investigation, Agbam reviewed plaintiff's other January 13, 2014 notes and discovered that plaintiff documented that she informed resident E.W. of his lab results and called his RP, although no one answered. (ECF No. 69 at 13). E.W. informed Agbam, however, that he had never received his lab results or spoken with plaintiff, and defendant noted that E.W. was his own RP. Id. Agbam again reported this issue. Id. Defendant also discovered during the investigation that, while plaintiff was on suspension, plaintiff called C.B.'s number to conduct her own investigation into the identity of the person who answered the phone. (ECF No. 69 at 14 (citing ECF No. 32-4 at 114)).

As a result of defendant's investigation, defendant subsequently decided to terminate plaintiff's employment and informed plaintiff of such during a meeting on February 19, 2014. (ECF No. 69 at 15). Defendant relied on its work rule A-28, an "all-encompassing" rule that required employees to "[c]onduct yourself in other major instances of conduct not specifically listed." Id. Specifically, defendant stated that, regarding resident J.B., plaintiff "failed to properly review the progress notes" and "failed to take appropriate steps to confirm the identity of the person answering the phone." (ECF No. 69 at 14). As to resident E.W., defendant "weighed the evidence and found E.W. more believable than [plaintiff.]" Id. Finally, defendant found that it was "unprofessional and insensitive" for plaintiff to call C.B.'s phone number "for her personal purposes" during her suspension. (ECF No. 69 at 15). Subsequent to her termination, plaintiff's position was filled with a white female. (ECF No. 67-1 at 8).

Plaintiff alleges that this investigation was "disingenuous" and began merely two weeks after her December 30, 2013 complaint that Jambora was discriminating against her and harassing her. (ECF No. 67-1 at 7). Plaintiff further alleges that, during December of 2013, managers at the Woodbridge Facility, including Administrator Froelich, learned that she was engaged in litigation against her previous employer, Genesis.[3] Id. On April 14, 2014 plaintiff initiated charges against defendant with the Equal Employment Opportunity Commission ("EEOC") and the Maryland Commission on Civil Rights ("MCCR") alleging that she was discriminated against on the basis of her race and national origin and retaliated against after

---

[3] Plaintiff filed a charge against Genesis with the Equal Employment Opportunity Commission ("EEOC") (ECF No. 67-1 at 6) and brought claims for discrimination and retaliation against Genesis in this court (Civil No. RDB-14-2694) (ECF No. 69 at 28). Plaintiff primarily references her EEOC charge in her Motion, while defendant primarily references the lawsuit in its Opposition. This discrepancy is not significant, however, as each constitutes protected activity. See Kearns v. Northrop Grumman Sys. Corp., Civil No. ELH-11-1736, 2014 WL 2170781 at *10 (D. Md. May 23, 2014) (quoting Johnson v. Giant Food, Inc., Civil No. JFM-00-3465, 2000 WL 1831962 at *6 (D. Md. Nov. 27, 2000) ("[A] protected activity is one in which the employee opposes an employment practice on the ground that it violates Title VII."). Accordingly, the court will refer to plaintiff's prior complaints generally as plaintiff's litigation against Genesis.

protesting such activity.  (ECF No. 32-1 at 9–10).  Plaintiff filed the instant case before this court on February 10, 2015.  (ECF No. 1).

In her Amended Complaint, plaintiff asserts three counts: (1) "unlawful suspension and termination of plaintiff Nnadozie, on account of race and national origin discrimination and retaliation, in violation of Title VII, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981"; (2) "retaliatory alteration of Nnadozie's working conditions, in violation of 42 U.S.C. § 2000e and 42 U.S.C. § 1981"; and (3) "hostile work environment, inflicted upon plaintiff Nnadozie, on account of her race and national origin, and in retaliation for protected activity, in violation of 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981." (ECF No. 8 at 8).  Specifically, in her first count, plaintiff alleges she was suspended without pay and ultimately terminated based on her race and national origin as well as her litigation against her prior employer, Genesis, and her internal discrimination complaints.  Id.  In her second count, plaintiff also alleges that defendant altered her working conditions by assigning her substantial additional duties in retaliation for her litigation against Genesis and her internal complaints.  (ECF No. 8 at 9).  Finally, in her third count, plaintiff alleges that defendant created and subjected plaintiff to a hostile work environment by allowing hostile conduct, including "altering her job duties, shouting at her, badgering her about her breaks, etc.," based on her race, national origin, litigation against Genesis, and internal discrimination complaints.  (ECF No. 8 at 10).

All defendants filed a motion for summary judgment as to all of plaintiff's claims in the Amended Complaint.  (ECF No. 32).  Plaintiff opposed this motion and argued that genuine disputes of material fact precluded summary judgment on all claims.  (ECF No. 39).  On November 28, 2016, the court granted defendants' motion.  (ECF No. 44).  Preliminarily, the court found that only HES was plaintiff's employer, and granted summary judgment as to all

remaining defendants.[4]  (ECF No. 44 at 1).  The court went on to find that plaintiff did not present any direct evidence of racial discrimination, and thus analyzed whether plaintiff made out a prima facie case of racial discrimination under the <u>McDonnell</u> burden-shifting framework. <u>Id.</u> (citing <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973)).  The court held that plaintiff failed to "establish that her job performance was satisfactory and that similarly situated employees outside of her class received more favorable treatment than did she." (ECF No. 44 at 2).  Alternatively, the court noted, "the reasons articulated by defendant for the termination of her employment constituted 'legitimate, non-discriminatory reason[s]' and plaintiff has not shown that the proffered reason is pretextual." <u>Id.</u> n.2.  Accordingly, the court granted summary judgment to defendant.  <u>Id.</u>

Plaintiff timely appealed the court's November 28, 2016 decision (ECF No. 46), but the Fourth Circuit Court of Appeals dismissed her appeal as interlocutory (ECF No. 49 at 5).   The Court stated that, while plaintiff's complaint "clearly alleged discrimination, retaliation, and harassment claims," and defendants moved for summary judgment on all three claims, the district court "failed to resolve the retaliation and harassment claims."  (ECF No. 49 at 4–5). Currently pending is Plaintiff's Motion for Reconsideration and Relief from the District Court's Determination Granting Defendants' Motion for Summary Judgment ("Plaintiff's Motion") in which plaintiff argues that the court wrongly granted summary judgment to defendant.  (ECF No. 67 at 10).  Defendant opposes this motion and ask the court to uphold the finding of summary judgment in favor of defendant on plaintiff's race discrimination claim and grant summary judgment on her remaining claims.  (ECF No. 69 at 9).

---

[4] As previously noted, plaintiff does not challenge this ruling, so the court will only consider plaintiff's motion for reconsideration as to HES, which, as noted above, is referred to as "defendant."

## II.    **RACIAL DISCRIMINATION CLAIM**

In its November 28, 2016 order, this court held that plaintiff failed to present any direct evidence of racial[5] discrimination, and plaintiff thus needed to establish a prima facie case of discrimination.  (ECF No. 44 at 1).  See Tibbs v. Baltimore City Police Dep't, Civil No RDB-11-1335, 2012 WL 3655564 at *3 (D. Md. Aug. 23, 2012) ("Where the record contains no direct evidence of discrimination or retaliation, plaintiff's claims must be analyzed under the burden-shifting scheme established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).")  Specifically, "[a]n employee establishes a prima facie case of disparate treatment on the basis of race . . . discrimination under Title VII and 42 U.S.C. § 1981 by showing that (1) she is a member of a protected class; (2) her job performance was satisfactory; (3) she was subjected to an adverse employment action; and (4) similarly situated employees outside of her class received more favorable treatment."  Id. at *4.  The court here found that plaintiff failed to establish the second and fourth elements of this test and granted defendants' motion for summary judgment.  (ECF No. 44 at 2).

Plaintiff argues that the district court "erred in dismissing [plaintiff's] Title VII and 42 U.S.C. § 1981 race discrimination claims.  It ignored all [plaintiff's] evidence to the contrary in finding that [plaintiff] failed to show she was performing satisfactorily, and failed even to acknowledge that she was replaced by someone white."  (ECF No. 67-1 at 23).  As to the second prong, plaintiff argues that the court failed to consider her proof that defendant's basis for alleging unsatisfactory behavior was pretextual.  Id.  Plaintiff further challenges "the entirety of [defendant's] evidence of unsatisfactory performance" and alleges that the court failed to view

---

[5] Although plaintiff also alleges discrimination on the basis of her national origin in her Amended Complaint (ECF No. 8 at 1), the court previously found that plaintiff "has presented no evidence to support that charge."  (ECF No. 44 at 2).  Plaintiff does not challenge this ruling in her Motion.  Accordingly, the court will consider her claim of discrimination on the basis of race only.

the evidence in the light most favorable to her. (ECF No. 67-1 at 24). As to the fourth prong, plaintiff argues that she met this element by demonstrating that her position was filled by a "similarly qualified white candidate," and that the court erred "by not even addressing the obvious white replacement comparator." Id.

In response, defendant argues that the court properly found that plaintiff could not establish the second or fourth prongs. (ECF No. 69 at 22). Specifically, defendant argues that plaintiff was not performing satisfactorily at the time of her termination because "it had evidence, after an investigation, that she falsely documented providing lab results to a deceased family member of resident J.B. and to an alert and oriented patient, resident E.W., . . . shared confidential patient information with someone not authorized to receive it . . . [and] admitted to using PHI [personal health information], that is, the deceased family member's phone number, for her own purposes, and contacting that number while on suspension." (ECF No. 69 at 23–24). Furthermore, defendant argues that plaintiff's alleged evidence of pretext "is insufficient to overcome [defendant's] legitimate non-discriminatory reasons to terminate her employment." (ECF No. 69 at 25). As to the fourth prong, defendant argues that plaintiff "cannot show that similarly situated employees outside her protected class were treated more favorably." (ECF No. 69 at 23). Defendant further argues that, while plaintiff was replaced with a white individual, this replacement was only in the position for two months before being replaced by a black woman and then a black male. Id.

The parties also dispute the proper standard of review for this motion. Plaintiff argues that the proper standard of review for "reconsideration requests when there is no final judgment as to all issues" is Federal Rule of Civil Procedure 54(b).[6] (ECF No. 70 at 6 (citing Bradford v.

---

[6] Although plaintiff originally cites to Federal Rules of Civil Procedure 59(e), 60(b)(5), (6), and "any other rule applicable to proper disposition of the matter in this [c]ourt subsequent to the Court of Appeals' dismissal of the

HSBC Mortg. Corp., 838 F. Supp. 2d 424, 427 (E.D. Va. 2012)). Defendant argues that, because "[t]he Federal Rules of Civil Procedure do not expressly recognize motions for 'reconsideration,'" the court should rely on Rules 59(e) and 60(b), which "authorize a district court to alter, amend, or vacate a prior judgment." (ECF No. 69 at 17 (citing Works v. Astrue, 2012 WL 380116 at *2 (D. Md. Feb. 3, 2012)). Defendant further argues that motions under each Rule are disfavored and should only be granted in exceptional circumstances, and that plaintiff does not meet these standards. (ECF No. 69 at 18–19).

Here, because the court's November 28, 2016 order did not resolve all three claims brought by plaintiff, the correct standard for review is Rule 54(b). Am. Home Assurance Co. v. KBE Building Corp., Civil No. CCB-13-1941, 2015 WL 1209940 at *1 (D. Md. March 16, 2015) ("A motion to reconsider an interlocutory order arises under Federal Rule of Civil Procedure 54(b).") While Rules 59(e), which allows a court to alter or amend a final judgment upon a motion filed within 28 days after the entry of the judgment, and 60(b), which allows a court to grant relief from a final judgment, "do not govern reconsideration of an interlocutory order, the Fourth Circuit has suggested that at least parts of those rules may guide a court's analysis." Cohens v. Md. Dep't. of Human Res., 933 F. Supp. 2d 735, 742 (D. Md. 2013). Specifically, courts will consider whether "(1) there has been an intervening change in controlling law; (2) there is additional evidence that was not previously available; or (3) the prior decision was based on clear error or would work manifest injustice." Am. Home Assurance Co., 2015 WL 1209940 at *1 (citing Nana-Akua Takyiwaa Shalom v. Payless Shoesource Worldwide, Inc., 921 F. Supp. 2d 470, 480 (D. Md. 2013)). Plaintiff need not, however, show

appeal for lack of jurisdiction," (ECF No. 67-1 at 9), in her Reply, plaintiff relies solely on Rule 54(b). (ECF No. 70 at 6).

"extraordinary circumstances," as is required by Rules 59(e) and 60(b). Id. (citing Netscape Commc'ns Corp. v. ValueClick, Inc., 704 F. Supp. 2d 544, 546 (E.D. Va. 2010)).

Plaintiff does not allege that there has been an intervening change in controlling law or that there is additional evidence that was not previously available. Accordingly, her "motion rises and falls on proof of 'clear error' or 'manifest injustice' . . . [her] 'motion may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment." Am. Home Assurance Co., 2015 WL 1209940 at *2 (quoting Tepeyac v. Montgomery Cty., 5 F. Supp. 3d 745, 770 (D. Md. 2014)). Plaintiff argued in her Opposition to Defendants' Motion for Summary Judgment ("Opposition") (ECF No. 39) that she established all four elements of a prima facie case of racial discrimination. (ECF No. 39 at 34). Specifically, she argued that she met the second prong because her performance was satisfactory prior to January 13, 2014, the date in question, and that a reasonable jury could find that defendant's reasons for her termination were pretextual. (ECF No. 39 at 35). She also argued that she met the fourth prong because she was replaced by a white American woman with the same qualifications as her. Id. While now she argues that the prior decision was based on clear error, she "merely rehearses arguments that [she] previously asserted and this court previously rejected. Retreading old ground cannot justify reconsideration." Am. Home Assurance Co., 2015 WL 1209940 at *2. Plaintiff has not established that the prior decision granting summary judgment for defendant on plaintiff's racial discrimination claim is based on "clear error or would work manifest injustice." Id. Accordingly, plaintiff's Motion is denied as to her racial discrimination claim, and the court will not disturb its prior decision granting summary judgment for defendant on Count I of plaintiff's Amended Complaint.

## III.   RETALIATION AND HOSTILE WORK ENVIRONMENT CLAIMS

### A.   Standard of Review

In its order dated November 28, 2016, the court did not address plaintiff's retaliation claims or hostile work environment claim.  (ECF No. 44).  Accordingly, the court must now determine whether summary judgment is appropriate.

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is properly considered "material" only if it might affect the outcome of the case under the governing law.  Id.  The party moving for summary judgment has the burden of demonstrating the absence of any genuine issue of material fact.  Fed. R. Civ. P. 56(a); Pulliam Inv. Co., Inc. v. Cameo Props., 810 F.2d 1282, 1286 (4th Cir. 1987).  On those issues for which the nonmoving party will have the burden of proof, however, it is his or her responsibility to oppose the motion for summary judgment with affidavits or other admissible evidence specified in Federal Rule of Civil Procedure 56.  Fed. R. Civ. P. 56(c); Mitchell v. Data Gen. Corp., 12 F.3d 1310, 1315–16 (4th Cir. 1993).  If a party fails to make a showing sufficient to establish the existence of an essential element on which that party will bear the burden of proof at trial, summary judgment is proper.  Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

When reviewing a motion for summary judgment, the court does not evaluate whether the evidence favors the moving or nonmoving party, but considers whether a fair-minded jury could return a verdict for the nonmoving party on the evidence presented.  Anderson, 477 U.S. at 252. In undertaking this inquiry, the court views all facts and makes all reasonable inferences in the

light most favorable to the nonmoving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The nonmoving party, however, may not rest on its pleadings, but must show that specific, material facts exist to create a genuine, triable issue. Celotex, 477 U.S. at 324. A "scintilla" of evidence in favor of the nonmoving party, however, is insufficient to prevent an award of summary judgment. Anderson, 477 U.S. at 252. Further, "mere speculation" by the nonmoving party or the "building of one inference upon another" cannot create a genuine issue of material fact. Cox v. Cty. of Prince William, 249 F.3d 295, 299–300 (4th Cir. 2001). Summary judgment should be denied only where a court concludes that a reasonable jury could find in favor of the nonmoving party. Anderson, 477 U.S. at 252.

## B.    Retaliation Claims

Counts I and II of plaintiff's Amended Complaint allege that defendant retaliated against plaintiff by altering her working conditions, suspending her, and ultimately terminating her, for her internal complaints and litigation against her prior employer, Genesis, in violation of Title VII and 42 U.S.C. § 1981. (ECF No. 8 at 8–9). "A plaintiff may prove that an employer took action with discriminatory or retaliatory intent through direct evidence or through the burden-shifting framework of McDonnell Douglas Corp. v. Green." Strothers v. City of Laurel, Md., 895 F.3d 317, 327 (4th Cir. 2018) (citing Foster v. Univ. of Md.-E. Shore, 787 F.3d 243, 249 (4th Cir. 2015)). Here, because plaintiff does not provide any direct evidence that defendant acted with retaliatory intent, she must first establish a prima facie case of retaliation under the McDonnell burden-shifting framework.

To establish a prima facie case of retaliation under Title VII and 42 U.S.C. § 1981, the plaintiff must show: "(1) she engaged in a protected activity; (2) the employer acted adversely against her; and (3) there was a causal connection between the protected activity and the asserted

adverse action." Id. (quoting Ziskie v. Mineta, 547 F.3d 220, 229 (4th Cir. 2008)). If plaintiff establishes a prima facie case, "[t]he burden then shifts to the [employer] to show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason." Id. (quoting Foster, 787 F.3d at 250). Then, "[i]f the employer makes this showing, the burden shifts back to the plaintiff to rebut the employer's evidence by demonstrating that the employer's purported nonretaliatory reasons were not its true reasons, but were a pretext for discrimination." Id.

### i. Protected Activity

Plaintiff first alleges that she has engaged in protected activity by making internal complaints about racial discrimination. Specifically, plaintiff alleges that on October 23, 2013, she protested Jambora's mistreatment of her to Administrator Froelich and stated that "Jambora would not treat [plaintiff] '[that] way' if [plaintiff] were not black." (ECF No. 67-1 at 11). Plaintiff alleges that she repeated this contention on December 30, 2013, when she met with Froelich and HR Director Kolesar. Id. Defendant argues that these complaints do not qualify as protected activity because plaintiff's belief that defendant was engaging in unlawful activity was not objectively reasonable. (ECF No. 69 at 30). Defendant states that plaintiff was unable to offer "evidence of a single instance where a similarly-situated white employee was treated more favorably" or "any comment, oral or written, by anyone that remotely speaks of her race, let alone a sufficient comment establishing an instance of mistreatment based on race." (ECF No. 69 at 31).

"[A] protected activity is one in which the employee opposes an employment practice on the ground that it violates Title VII." Kearns v. Northrop Grumman Sys. Corp., Civil No. ELH-11-1736, 2014 WL 2170781 at *10 (D. Md. May 23, 2014) (quoting Johnson v. Giant Food, Inc.,

Civil No. JFM-00-3465, 2000 WL 1831962 at *6 (D. Md. Nov. 27, 2000)).  "Protected oppositional activity 'may include staging informal protests and voicing one's own opinions in order to bring attention to an employer's discriminatory activities, as well as complain[ts] . . . about suspected violations' of Title VII."  Id. (citing Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 259 (4th Cir. 1998)).  Additionally, "the Fourth Circuit has held that the filing of an EEOC complaint generally constitutes protected activity."  Id. (citations omitted).  "Although it is not necessary that an employee's underlying discrimination claim be meritorious in order to succeed on a retaliation claim . . . it is necessary that an employee have an objectively reasonable belief that the employer committed an unlawful employment practice."  Hurtt v. Baltimore County, Maryland, Civil No. JKB-12-445, 2014 WL 583008 (D. Md. Feb. 10, 2014) (citations omitted).

In Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264 (4th Cir. 2015), the plaintiff, a female employee of the defendant, alleged that she was fired in retaliation for her complaints to management that she had been racially harassed by her manager.  Id. at 269–70.  Specifically, the plaintiff complained that her manager shouted at her, threatened her "in words that included, '[I'm] going to get [you]' and '[I'm] going to make [you] sorry," and called her a "porch monkey."  Id.  The Court found that a jury could reasonably find that the plaintiff reasonably believed that there was a hostile work environment in progress based on this isolated incident, noting that "'porch monkey' is a racial epithet that is not just humiliating, but 'degrading and humiliating in the extreme.'"  Id. at 285 (quoting Spriggs v. Diamond Auto Glass, 242 F.3d 179, 185 (4th Cir. 2001)).

On the other hand, in Session v. Montgomery County School Board, 462 F. App'x 323 (4th Cir. 2012), the plaintiff, a black female, argued that the Superintendent, a white female,

made "two racially derogatory comments" that "amounted to racial harassment."[7]  Id. at 324.
The Court found that these two comments were "inadequate as a matter of law for [the plaintiff]
to have held an objectively reasonable belief that she confronted an abusive work environment
that violated Title VII: The comments were not frequent, severe, physically threatening, or
objectively humiliating; and the comments could not have reasonably interfered with [the
plaintiff's] work performance."  Id. at 326.  Similarly, in Hurtt, the court found that the plaintiff
"lacked an objectively reasonable belief that she was actually being subjected to unlawful
harassment" when she filed internal complaints alleging racial discrimination, noting that the
plaintiff's complaints were "based merely on the race of the speakers, not on whether anything
they said was a product of a racially discriminatory intent or created a sufficiently severe or
pervasive atmosphere of racial hostility.  Id. at *6.

        Here, as in Session and Hurtt, plaintiff has offered insufficient evidence of racial
discrimination to establish that she had an objectively reasonable belief that she was protesting
unlawful behavior.   Plaintiff argues that she inferred that her new, non-black supervisor's
"rudeness, hostility, and de facto demotion" was inflicted because of her race.  (ECF No. 67-1 at
16).   Plaintiff further argues that "[s]he thought this at least in part because her prior, black
supervisor, did none of the harsh things being done by her new, non-black supervisor."  Id.
While these arguments clearly show that plaintiff subjectively believed that she was experiencing
racial discrimination, plaintiff has offered no evidence to "render reasonable her belief" that she
was the victim of racial discrimination.  Boyer-Liberto, 786 F.3d at 285.   Plaintiff is unable to

---

[7] Plaintiff first alleged that, while speaking with a friend, the Superintendent asked the plaintiff about how she styled
her hair and commented "oh, you have that good hair," which the plaintiff "complained that the comment meant that
[the plaintiff] did not 'have hair like other black people' and that it was a 'condescending remark.'"  Id. at 324.
Plaintiff then alleged that, during a meeting, the Superintendent asked the staff to bring in baby pictures of
themselves for a team-building contest on who could guess the identities of the pictures and stated that they would
need to use fake pictures because "some of us have more melanin in our skin than others."  Id.  Plaintiff stated that
"[b]eing a fair-skinned African–American person, I knew that participating in that contest would make me the
recipient of comments/questions about my baby picture not 'looking black.'"  Id.

point to a single reference to her race, much less "frequent, severe, physically threatening, or objectively humiliating" comments that would interfere with her work performance.  Session, 462 F. App'x at 326.  Rather, as in Hurtt, plaintiff points only to her supervisor's race and produces no evidence that the supervisor's actions were racially motivated and not merely rude behavior.  "[M]erely labelling others' conduct as 'discriminatory,' 'harassing,' or 'retaliatory' is insufficient to carry the day."  Hurtt, 2014 WL 583008 at *6.

Plaintiff argues that her complaints are protected by the early reporting doctrine, which "encourages both employees to 'early report,' and employers to take aggressive action to root out discrimination."  (ECF No. 70 at 10 (citing Crawford v. Metro. Gov't of Nashville & Davidson Cty., Tenn., 555 U.S. 271 (2006)).  Plaintiff further argues that, in the early reporting context, she "need not identify a nonblack comparator or otherwise make out a prima facie race discrimination case in order for her opposition activity to be protected, and for treatment of her complaint as objectively reasonable."  Id.  Similarly, plaintiff argues that "the underlying discriminatory claim need not even ultimately be meritorious for a retaliation claims [sic] to succeed."  (ECF No. 67-1 at 13 (citing Peters v. Jenney, 327 F.3d 307, 320–21 (4th Cir. 2003)).  Both of these arguments fail.  While plaintiff need not establish a meritorious prima face case of race discrimination to succeed, here, she fails to point to any evidence at all to suggest that her belief that defendant was engaging in unlawful activity was objectively reasonable.  Accordingly, plaintiff cannot establish that she engaged in protected activity by making internal complaints about her supervisor's behavior.

Plaintiff also argues, however, that defendant retaliated against her based on her litigation against her prior employer, Genesis.  (ECF No. 67-1 at 18).  It is clear that this litigation constitutes protected activity, as the basis of litigation was plaintiff's complaints of racial

discrimination by Genesis.[8]  See Kearns v. Northrop Grumman Sys. Corp., Civil No. ELH-11-1736, 2014 WL 2170781 at *10 (D. Md. May 23, 2014) (quoting Johnson v. Giant Food, Inc., Civil No. JFM-00-3465, 2000 WL 1831962 at *6 (D. Md. Nov. 27, 2000) ("[A] protected activity is one in which the employee opposes an employment practice on the ground that it violates Title VII.").  Accordingly, the first element, that plaintiff engaged in protected activity, is met by plaintiff's complaint against Genesis only.

### ii. Adverse Action

With respect to the second element, plaintiff was placed on leave without pay and later terminated, both of which constitute material adverse actions for purposes of the second element. See White v. City of Annapolis, Civil No. JFM-13-1330, 2015 WL 5009853 at *5 (D. Md. Aug. 21, 2015) ("Actual termination . . . [is] clearly sufficiently adverse); Fink v. Richmond, Civil No. DKC-2007-0714, 2009 WL 3216117 at *10–11 (D. Md. Sept. 29, 2009) (being placed on leave without pay constitutes an adverse employment action).  The parties dispute, however, as to whether plaintiff's allegations in Count II for retaliatory alteration of plaintiff's working conditions constitute a materially adverse action.

Title VII's "antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67 (2006).  To prevail on a claim of retaliation, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, "which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Id. at 68 (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C.C. 2006)).  In Burlington Northern, the plaintiff, a female, was reassigned from working as a forklift

---

[8] While defendant does dispute that it was aware of the substance of plaintiff's litigation against Genesis, it does not dispute that it was aware that plaintiff was involved in litigation against her prior employer.  (ECF No. 69 at 33).

operator to working as a "'track laborer,' a job that involves removing and replacing track components, transporting track material, cutting brush, and clearing litter and cargo spillage." Id. at 57, 71. The Court noted that the question of "[w]hether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and 'should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.'" Id. at 71 (quoting Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 81 (1998)). The Court there found that "a jury could reasonably conclude that the reassignment of responsibilities would have been materially adverse to a reasonable employee" when the jury had "considerable evidence that the track laborer duties were 'by all accounts more arduous and dirtier' and that the forklift operator position was more prestigious and "objectively considered a better job." Id. (quoting White v. Burlington N. & Santa Fe Ry. Co., 364 F.3d 789, 803 (6th Cir. 2004)). The Court rejected the defendant's arguments that "a reassignment of duties cannot constitute retaliatory discrimination where, as here, both the former and present duties fall within the same job description," finding that "[c]ommon sense suggests that one good way to discourage an employee such as White from bringing discrimination charges would be to insist that she spend more time performing the more arduous duties and less time performing those that are easier or more agreeable." Id. at 70–71.

Plaintiff alleges that defendant altered her working conditions in retaliation for her protected activity by imposing "radically changed and more onerous working conditions on Nnadozie, when they assigned her substantial additional duties, including those normally assigned to charge nurses, in addition to her regular supervisory duties associated with her position as a shift supervisor." (ECF No. 8 at 9). Plaintiff further argues that, by reassigning plaintiff from being a supervisor to a floor nurse, she was subject to a de facto demotion. (ECF

No. 39 at 1, 3).  In response, defendant argues that plaintiff, as a supervisor, was responsible for "performing any miscellaneous work assignments as may be required" and "may be required to do floor work."  (ECF No. 69 at 10).  As in <u>Burlington Northern</u>, however, plaintiff has presented evidence that working as a floor nurse is less prestigious than working as a supervisor and that supervisors were not required to perform floor work as part of their regular duties.  (ECF No. 39 at 4).  Accordingly, a reasonable jury could find, as in <u>Burlington Northern</u>, that defendant's reassignment of plaintiff constituted a materially adverse action.  Plaintiff has satisfied the second element of the <u>McDonnell</u> test.

### iii.  Causal Connection

To satisfy the third element, plaintiff must prove a causal connection between her protected activity and the adverse action.  The Fourth Circuit has held that establishing a causal relationship at the prima facie stage "is not an onerous burden." <u>Strothers v. City of Laurel, Md.</u>, 895 F.3d 317, 335 (4th Cir. 2018) (citing <u>Burgess v. Brown</u>, 466 F. App'x 272, 282 (4th Cir. 2012) ("[V]ery little evidence of a causal connection is required to establish a prima facie case of retaliation."))  "An employee may establish <u>prima</u> <u>facie</u> causation simply by showing that (1) the employer either understood or should have understood the employee to be engaged in protected activity and (2) the employer took adverse action against the employee soon after becoming aware of such activity." <u>Id.</u> at 335–36 (emphasis in original).  As previously discussed, the only protected activity that plaintiff engaged in that may form the basis for her retaliation claim is her litigation against her former employer, Genesis.  Accordingly, plaintiff must establish that, at the time of each materially adverse action, defendant was aware that plaintiff was engaged in protected activity against Genesis.

As to plaintiff's alleged de facto demotion, as noted by defendant, plaintiff testified that she was no longer given floor assignments after October 23, 2013, the date that she complained to Froelich about such assignments. (ECF No. 32-1 at 41 (citing ECF No. 32-4 at 67)). Plaintiff has offered no evidence, however, that Jambora, who was the individual who assigned plaintiff floor duties, was aware of her lawsuit against Genesis before October 23, 2013. Plaintiff notes that Jambora testified that she believed that she learned of plaintiff's lawsuit in January of 2014, "right around right after the suspension was issued." (ECF No. 67-1 at 22 (quoting ECF No. 39-5 at 33–34)). While defendant did state in its response to plaintiff's Interrogatory No. 4 that Jambora believed that she first learned of this information "in late October 2013," defendant also stated that Jambora "cannot recall precisely when she learned this information." (ECF No. 37-3 at 4). Accordingly, plaintiff has not offered any evidence that, at the time of defendant's alleged de facto demotion, defendant was aware that plaintiff was engaged in protected activity against Genesis, and therefore cannot establish that there was a causal connection between her protected activity and the materially adverse action.

The parties further dispute whether plaintiff's supervisors were aware of the substance of plaintiff's claims against her former employer. The Fourth Circuit has held that "the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of the prima facie case" because, "by definition, an employer cannot take action because of a factor of which it is unaware." Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998). "[A]n employee's complaint constitutes protected activity when the employer understood, or should have understood, that the plaintiff was opposing discriminatory conduct." Burgess v. Bowen, 466 F. App'x 272, 282 (4th Cir. 2012) (citing Richardson v. Richland Cty. School Dist. No. 1, 52 F. App'x 615, 617 (4th Cir.

2002) ("[I]mplicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII.")  Here, defendant argues that there is no evidence that any of plaintiff's supervisors were aware of the substance of her complaints against Genesis (ECF No. 69 at 32), while plaintiff argues that "[t]here is sufficient evidence to infer" that her supervisors were aware of her protected activity against Genesis (ECF No. 70 at 15).

Plaintiff first points to the deposition testimony of her co-worker, Cordilia Agbam, and notes that Agbam stated that plaintiff informed her that she filed a complaint against Genesis because it was "racist against her." (ECF No. 67-1 at 19).  While Agbam stated that she did not share that information with anyone else, (ECF No. 39-4 at 6–7), Administrator Staci Froelich stated in her deposition that Agbam informed her that plaintiff "was legally taking action against a previous employer." (ECF No. 39-7 at 20).  Plaintiff also notes that her supervisor, Michelle Jambora, stated in her deposition testimony that she overheard that plaintiff "had a history of filing lawsuits" from Agbam and another manager, Yabo.[9]  (ECF No. 39-5 at 24–25).  Jambora also testified that she informed Froelich of what she had overheard, although she could not remember when she did so.  (ECF No. 39-5 at 27).  Plaintiff argues that, based on this evidence, reasonable jurors could conclude that "Jambora and Froelich learned from Agbam that [plaintiff] filed EEOC claims and understood they were based on Genesis being 'racist against her.'"  (ECF No. 67-1 at 20).

Defendant acknowledges that there is evidence that plaintiff's supervisors were aware that plaintiff had sued Genesis but argue that "there is no evidence . . . that her supervisors knew

---

[9] It is unclear from the deposition testimony whether "Yabo" is the manager's first or last name, but it is the only name provided.

about the substance of her claims." (ECF No. 69 at 33). Defendant notes that Phyllis Eiring, the facility's HR Director, participated in the decision to terminate plaintiff, and testified that defendant did not know about plaintiff's claims, types of claims, or the nature of her claims against Genesis. Id. Defendant also points to the testimony of Jambora, who "was asked repeatedly if she knew anything about the nature of [plaintiff's] claims against her former employer, Genesis, and consistently answered that she did not, nor was she aware of anyone inquiring about the types of claims." Id. Finally, defendant notes that Agbam "testified that she told no one about what [plaintiff] communicated to her about the lawsuit against Genesis." Id. Defendant acknowledges that there is a conflict with this testimony, as both Jambora and Froelich testified that they heard about plaintiff's lawsuit from Agbam, but argues that this "is not a material factual dispute," and that "there is no evidence that they knew what the claims were about, only that she had sued a prior employer." Id.

While plaintiff has clearly established that defendant was aware that plaintiff was engaged in litigation against Genesis, plaintiff has not pointed to any direct evidence that defendant was aware of the substance of these claims. Plaintiff notes, however, that "knowledge of a plaintiff's protected activity can be inferred from evidence of the prior interaction of individuals with such knowledge and those taking the adverse employment action," and argues that a reasonable juror could infer such knowledge here. (ECF No. 67-1 at 18 (quoting Hicks v. SSP Am., Inc., 490 F. App'x 781, 785 (6th Cir. 2012)). In Hicks, the Sixth Circuit held that the fact that two of plaintiff's co-workers knew about the protected activity, coupled with the plaintiff's supervisor ongoing interactions with these co-workers during the relevant period, supported an inference that the supervisor was aware of plaintiff's protected activity. Id. at 785. Similarly, plaintiff points to Mathews v. Massage Green LLC, et al., No. 14-cv-13040, 2016 WL

1242354 (E.D. Mich. March 30, 2016), where the court held that the plaintiff presented sufficient evidence to support an inference that the plaintiff's supervisor, who made the decision to terminate the plaintiff, was aware of the plaintiff's protected activity "by virtue of his ongoing interactions with . . . the owner of the business, who specifically had such knowledge." Id. at *15.

Defendant does not dispute that "knowledge of protected activity may be inferred from circumstantial evidence" but argues that "the real issue is the quantity and quality of circumstantial evidence necessary to allow a reasonable inference of knowledge." (ECF No. 69 at 34). Defendant points to Talavera v. Shah, 683 F.3d 303 (D.C. Cir. 2011), a case in which the plaintiff alleged that she was not chosen for promotion after engaging in protected activity. Id. at 306. The plaintiff argued that Streufert, her prior supervisor and the person who made the promotion selection, must have known about her complaint, relying on the close temporal proximity between her protected activity and his promotion decision and the fact that he worked closely with her current supervisors, who knew about her protected activity, and discussed "personnel matters" and hung out with him on a regular basis. Id. at 313. The court held that the plaintiff offered insufficient evidence to support an inference that Streufert was aware of her protected activity, given his denial under oath that he knew of her complaint, as "the fact that Streufert had been her previous supervisor still requires a speculative leap that her then-current supervisors would have discussed the complaint with him." Id.

Unlike in Talavera, however, plaintiff has offered evidence that Agbam, who was aware of the substance of plaintiff's claims against Genesis, discussed the complaint with plaintiff's supervisors, Jambora and Froelich. (ECF Nos. 39-5 at 24–25, 39-7 at 20). As in Hicks and Mathews, Agbam's interactions with Jambora and Froelich support an inference that defendant

was aware of the substance of plaintiff's claims against Genesis. While Agbam "testified that she told no one about what [plaintiff] communicated to her about the lawsuit against Genesis," (ECF No. 69 at 33), this testimony contradicts Jambora and Froelich's testimony, both of whom testified that they learned about plaintiff's litigation from Agbam. (ECF Nos. 39-5 at 24–25, 39-7 at 20). A reasonable juror could find that this conflicting testimony, paired with Agbam's ongoing interactions with Jambora and Froelich, support an inference that defendant was aware of the substance of plaintiff's claims against Genesis. Accordingly, plaintiff has established the third element of the <u>McDonnell</u> test as to her suspension without pay and termination. Plaintiff therefore has met her burden of establishing a prima facie case of retaliation.

### iv. Legitimate, Non-Discriminatory Reason for Actions and Pretext

Once a plaintiff has established a prima facie case of retaliation, "[t]he burden then shifts to the [employer] to show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason." <u>Strothers v. City of Laurel, Md.</u>, 895 F.3d 317, 328 (4th Cir. 2018) (citing <u>Foster v. Univ. of Md.-E. Shore</u>, 787 F.3d 243, 250 (4th Cir. 2015)). Once the employer has met this burden, the burden shifts back to the plaintiff, who must establish that "retaliation was a but-for cause of a challenged adverse employment action." <u>Foster</u>, 787 F.3d at 252. "In order to carry this burden, a plaintiff must establish 'both that the [employer's] reason was false and that [retaliation] was the real reason for the challenged conduct.'" <u>Id.</u> (quoting <u>Jiminez v. Mary Washington Coll.</u>, 57 F.3d 369, 378 (4th Cir. 1995)).

Here, the court previously found that plaintiff was terminated for three reasons. (ECF No. 44 at 2). "First, she had falsely documented providing lab results to a deceased family member of J.B., who had predeceased J.B. Second, defendant determined that plaintiff had used the deceased family member's phone number, for her own purpose, contacting that number while

she was on suspension. Third, defendant further determined that plaintiff had falsely documented that she had communicated lab results directly to resident E.W., who denied that plaintiff had spoken to him. Further, defendant determined that plaintiff had falsely documented that she called E.W.'s responsible party and the phone rang with no answer." Id. The court concluded that "the reasons articulated by defendant for the termination of [plaintiff's] employment constituted 'legitimate, non-discriminatory reason[s]' and plaintiff has not shown that the proffered reason is pretextual."[10]  (ECF No. 44 at 2 n.2).

As previously discussed, because the court addressed this issue, but did not resolve all three claims brought by plaintiff, in its November 28, 2016 order, the correct standard for review for this ruling is Rule 54(b). Am. Home Assurance Co. v. KBE Building Corp., Civil No. CCB-13-1941, 2015 WL 1209940 at *1. Under Rule 54(b), "courts will consider whether "(1) there has been an intervening change in controlling law; (2) there is additional evidence that was not previously available; or (3) the prior decision was based on clear error or would work manifest injustice." Id. (citing Nana-Akua Takyiwaa Shalom v. Payless Shoesource Worldwide, Inc., 921 F. Supp. 2d 470, 480 (D. Md. 2013)).  Here, plaintiff does not allege that there has been an intervening change in controlling law or that there is additional evidence that was not previously available, so she must rely on the third factor.  As previously noted, however, plaintiff's motion "may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment." Am. Home Assurance Co., 2015 WL 1209940 at *2 (quoting Tepeyac v. Montgomery Cty., 5 F. Supp. 3d 745, 770 (D. Md. 2014)).

In her Opposition to defendants' original motion for summary judgment, plaintiff argued that a reasonable juror could find that defendant's asserted reasons for her termination were

---

[10] While the court did not directly address plaintiff's suspension without pay during defendant's investigation, the defendant articulated the same reasons for the suspension, and plaintiff offered the same arguments that these reasons were pretextual.

pretextual. (ECF No. 39 at 38). Among other arguments, plaintiff alleged that statements made by Jambora showed retaliatory animus and intent, that Froelich falsely stated that plaintiff violated numerous policies and guidelines, that Froelich's justifications for terminating plaintiff were inconsistent, and that Jambora's credibility was strongly disputed. (ECF No. 39 at 37–47). In her Motion, plaintiff now argues that the prior decision was based on clear error, but again "merely rehearses arguments that [she] previously asserted" in her Opposition to Defendants' Motion for Summary Judgment (ECF No. 39), which cannot justify reconsideration. See Am. Home Assurance Co., 2015 WL 1209940 at *2. Plaintiff therefore has failed to establish that the court's prior conclusions that defendant terminated plaintiff's employment for legitimate, non-discriminatory reasons and that plaintiff failed to establish that said reasons were pretextual were "based on clear error or would work manifest injustice." Id. Additionally, the court has reviewed all of plaintiff's allegations and similarly concludes that plaintiff has not met her burden of establishing that defendant's reasons for suspending plaintiff without pay and ultimately terminating her were false and that retaliation was the real reason for defendant's actions. Foster, 787 F.3d at 252. Accordingly, defendant is entitled to summary judgment on plaintiff's retaliation claims, as it has properly established that it terminated plaintiff's employment for legitimate, non-discriminatory reasons, and plaintiff has failed to establish that said reasons were pretextual. Plaintiff's Motion is denied as to her retaliation claims.

### C.     Hostile Work Environment Claim

Plaintiff's third count alleges that defendant created and subjected plaintiff to a hostile work environment by permitting hostile conduct, including "altering her job duties, shouting at her, badgering her about her breaks, etc." (ECF No. 8 at 10). To survive summary judgment, plaintiff must show "(1) unwelcome conduct; (2) that is based on the plaintiff's [protected

status]; (3) which is sufficiently severe or pervasive to alter her conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." Strothers v. City of Laurel, Md., 895 F.3d 317, 328 (4th Cir. 2018) (quoting Okoli v. City of Baltimore, 648 F.3d 216, 220 (4th Cir. 2011)). While defendant does not dispute that the first element is met, defendant argues that plaintiff has failed to establish elements two, three, and four. (ECF No. 69 at 30).

### i. Racially-Based Harassment

"The second element of a hostile environment claim requires that the offending conduct be based on the employee's 'race, color, religion, sex, or national origin.'" Strothers, 648 F.3d at 329 (quoting 42 U.S.C. § 2000e-2). "'Title VII does not prohibit all verbal or physical harassment in the workplace'—it is directed only at actions that occur 'because of' one of the protected statuses." Id. (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998)). Here, plaintiff alleges that defendant created and subjected her to a hostile work environment because of her race and national origin.[11] Defendant argues, however, that "[n]one of the alleged conduct that [plaintiff] describes is even remotely based on her race nor her national origin." (ECF No. 32-1 at 46).

In Hawkins v. PepsiCo, Inc., 203 F.3d 274 (4th Cir. 2000), the plaintiff, a black female, alleged that her supervisor, Sally Price, a white female, created a racially hostile environment by treating her poorly, while failing to subject any of her white co-workers to the same treatment. Id. at 276, 281. The court held, however, that the defendant was entitled to summary judgment on the plaintiff's hostile environment claims when the plaintiff's complaints about her supervisor's management style were "without a hint of racial significance" and the plaintiff

---

[11] While plaintiff also alleges that defendant was motivated by her internal discrimination complaints and litigation against her former employer, Genesis, these claims have already been addressed in the court's discussion of Counts I and II of plaintiff's Amended Complaint (ECF No. 8 at 8–9).

presented no facts to show that her allegedly disparate treatment "was due to race rather than Price's admittedly low regard for [plaintiff's] individual performance." <u>Id.</u> at 281. The court noted that, even if the plaintiff's supervisor "harbored some personal dislike of [her] that made [her] job more difficult or stressful, '[a]n employer is not required to like his employees." <u>Id.</u> (quoting <u>Williams v. Cerberonics, Inc.</u>, 871 F.2d 452, 457 (4th Cir. 1989)).

Similarly, here, plaintiff offers no evidence that defendant's conduct was motivated by race. Plaintiff alleges that Jambora "purposefully inflicted extensive pain upon her," but merely states that "[a]s [d]efendants lack explanation as the reason for their harassment of [plaintiff], jurors can infer the reason was [plaintiff's] race." (ECF No. 39 at 49). While plaintiff points to the additional duties and floor work that Jambora assigned to her, as noted by defendant, "nothing about them has any bearing on [plaintiff's] race." (ECF No. 41 at 17). Indeed, defendant notes that "[t]he only individuals [plaintiff] claims were treated differently than she was are four black R.N. supervisors." (ECF No. 32-1 at 17). Additionally, while plaintiff points to the October 1, 2013, phone call with Jambora as the start of the harassment, during the call, Jambora did not mention plaintiff's race or national origin, and only addressed plaintiff's performance.[12] (ECF No. 32-1 at 16). Accordingly, even viewed in the light most favorable to plaintiff, plaintiff has failed to offer any evidence that defendant's conduct was based on her race and/or national origin.

## ii. Sufficiently Severe or Pervasive Conduct

Even if plaintiff had established that defendant's conduct was racially motivated, defendant's hostile work environment claim also fails because defendant's conduct is not sufficiently severe or pervasive to constitute a hostile work environment. To survive summary

---

[12] While the parties disagree over the contents of the phone call, defendant states that Jambora "coached [plaintiff] on the importance of answering the phone promptly," (ECF No. 32-1 at 16), and plaintiff states that Jambora "accused her of inability to manage her employees," among other accusations (ECF No. 39 at 2).

judgment, plaintiff must establish that her work environment is "objectively hostile, not merely subjectively so." Hemphill v. ARAMARK Corp., Civil No. ELH-12-1584, 2014 WL 1248296, at *13 (D. Md. Mar. 25, 2014) (citing Bonds v. Leavitt, 629 F.3d 369, 385 (4th Cir. 2011), aff'd, 582 F. App'x 151 (4th Cir. 2014). "In making the determination of whether a work environment is objectively hostile, several factors are relevant, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Id. The Fourth Circuit has held that "plaintiffs must 'clear a high bar' in order to satisfy this test, holding that complaints premised on 'rude treatment' or 'callous behavior' are not actionable." Brady v. Bd. of Educ. of Prince George's Cty., 222 F. Supp. 3d 459, 472 (D. Md. 2016) (quoting EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 315–16 (4th Cir. 2008)). "[E]ven isolated incidents of harassment can constitute a hostile workplace claim," however, "if severe enough." Id. (citing Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 280 (4th Cir. 2015) (holding that supervisor's "odious" use of a racial slur created a hostile workplace).

In Hemphill, the plaintiff, a black male who worked as a Chef/Manager, alleged that his employer required him to perform more work than his nonblack colleagues, including reporting directly to its client when the kitchen ran out of supplies, placed him on a Performance Improvement Plan ("PIP"), and issued a written counseling statement to him for discriminatory reasons. 2014 WL 1248296 at *10. The court held that these incidents were not sufficiently severe or pervasive as to constitute a hostile work environment, finding that "the assignment of additional work, the requirement that plaintiff report to the client when supplies were running low, the issuance of a written counseling statement, and placement on a PIP are not 'objectively abusive actions.'" Id. at *14 (citing Combs–Burge v. Rumsfeld, 170 F. App'x 856, 862 (4th Cir.

2006)).  The court compared the facts at hand to those in <u>Collier v. Ram Partners, Inc.</u>, 159 F. Supp. 2d 889 (D. Md. 2001), a case in which the court found that the plaintiff had offered sufficient evidence for a reasonable trier of fact to find that the plaintiff's co-worker's conduct was sufficiently severe or pervasive to create a hostile work environment when "(1) racial epithets were used repeatedly; (2) were coupled with physical threats; and (3) evidence supported the conclusion that racial epithets were knowingly tolerated by management." <u>Id.</u>  The <u>Hemphill</u> court found that, unlike in <u>Collier</u>, the defendant's conduct was "far from the conduct necessary to establish actionable harassment." <u>Id.</u>

Similarly, here, plaintiff has failed to allege conduct that is sufficiently severe or pervasive to constitute a hostile work environment.  Plaintiff argues that she has presented evidence that defendant's conduct was both severe and pervasive.  (ECF No. 67-1 at 39).  Plaintiff alleges that defendant subjected her to a hostile work environment by permitting hostile work conduct including "altering her job duties, shouting at her, badgering her about her breaks, etc." (ECF No. 8 at 10).  Plaintiff states that this behavior began on October 1, 2013, when Jambora called the office three times and, on the third time, "screamed at [plaintiff] and threatened her job."[13] (ECF No. 39 at 2).  Following this call, plaintiff alleges that Jambora "frequently reassigned [plaintiff] from being a House Supervisor to being a Floor Nurse," which plaintiff described as "essentially a demotion," and assigned plaintiff "additional duties that would require her to work another shift." (ECF No. 39 at 4).  Plaintiff also states that "Jambora called [plaintiff] multiple times every night, scrutinizing her, and even how long her breaks were." <u>Id.</u>  As in <u>Hemphill</u>, the assignment of additional work does not constitute an "objectively abusive action."  2014 WL 1248296 at *14.  Similarly, unlike in <u>Collier</u>, while

---

[13] Plaintiff alleges that Jambora stated "I can't have you there as a supervisor if you don't know how to run these people," accused her of not doing her job, told her "[w]e can't be paying you to do nothing," and questioned whether plaintiff could be a supervisor at all.  (ECF No. 39 at 2).

plaintiff has alleged instances of "rude treatment" or "callous behavior" by Jambora, plaintiff has not alleged any conduct that rises to the level of actionable harassment. <u>Brady</u>, 222 F. Supp. 3d at 472. Accordingly, defendant is entitled to summary judgment as to plaintiff's hostile work environment claim, and plaintiff's Motion is denied as to these claims.

## IV.     <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff's Motion (ECF No. 67) is DENIED. A separate order will be issued.


Date:  March  _15__, 2019                      _____/s/_____
                                               Beth P. Gesner
                                               Chief United States Magistrate Judge